STATE v. J. M. NIPPER AND JIM JOHNSON.

(Filed 25 March, 1914.)

**Convicts—Punishment—Discipline—Flogging.**

Flogging convicts to enforce discipline is not authorized by any statute nor any valid regulation, and there being no legal regulation in this case permitting it, its infliction is contrary to law. (The constitutional and statutory authority as a matter of discipline discussed by CLARK, C. J.)

WALKER, HOKE, and BROWN, JJ., concur in result.

STATE *v.* NIPPER.

APPEAL by defendant from *Cooke, J.,* at September Term, 1913, of WAKE.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*R. N. Simms, Armistead Jones & Son, and J. W. Bunn for defendants.*

CLARK, C. J. The defendant Nipper was supervisor in charge of a camp of convicts working upon the roads of Wake County, and the defendant Johnson was a guard at said camp. They were charged with assaulting, beating, and wounding one Dan Gallagher, a convict under their charge and supervision, with a leather strap 16 inches long and 3½ inches wide, attached to a wooden handle 5 inches long, whereby he was badly beaten and bruised. Said Gallagher was a man between 40 and 45 years of age. He was flogged on his bare flesh. A few hours later he was taken ill, and died that afternoon. The county physician testified that he did not think the death of the said Gallagher was attributable in any way to the whipping. The chastisement was inflicted for refusal to work when ordered to do so. It was in evidence that "chastisement with a strap as a means of discipline for prisoners had been in general use and adoption and had been generally practiced in Wake County for more than a generation."

The court stated from the bench, before the argument began, that "after full consideration of the subject, he had reached the conclusion that under the Constitution and laws of this State the authorities who have control over convicts have no right to administer whippings to them for causes of discipline, and that this feature was eliminated from the further discussion of the case." The exception to this presents the controversy before us. The jury found the defendants guilty, and his Honor imposed a fine of $10 and costs on each defendant.

The indictment was not for homicide, but for assault. It was doubtless due to the fact that there was absence of all evidence of malice, the testimony of the physician above stated, and the further evidence that the use of such punishment had always been customary, that his Honor imposed so light a punishment.

The Attorney-General presents for our consideration the fact that the Constitution, Art. XI, sec. 1, declares that "Death, im-

166—18ᵉ

prisonment with or without hard labor, fines, removal from office, and disqualification to hold office" shall be the only punishments known to the laws of this State. Previous to 1868 we had retained the common-law punishments by which many corporal punishments could be inflicted, such as branding for manslaughter, cropping the ears for perjury, setting in the stocks, and flogging. The Constitution of 1868 intended by the above provisions to restrict the sentences which might be imposed by the courts upon conviction of crime to those above enumerated.

This constitutional provision has no direct application to the discipline required in our jails and penitentiaries, for if so it would prevent solitary confinement, restriction of rations, and other reasonable punishments that are in customary use in prisons and penitentiaries.

The question whether flogging can be used as part of the discipline in our State and county prisons depends not alone upon the constitutional provision, but also upon the question whether it is reasonable or authorized. Laws 1909, ch. 281, sec. 6, provides: "The convicts sentenced for hard labor shall be under the control of the county commissioners of said county, and said authorities shall have power to enact and enforce all needful rules and regulations for the successful working of all convicts upon the highways, and commit to the superintendent or supervisors the custody of the whole and any part of the convict force. And they may authorize and empower them to use such discipline only as may be necessary to carry out the rules and regulations in the working of the highways to which said convicts may be put by the order of the county commissioners to *the same extent as is allowed by law to the authorities of the penitentiary in the custody and control of convicts committed to the State's Prison.*" This act is applicable only to Wake County.

We find no rule or regulation of the county commissioners authorizing the flogging of convicts, and as we find no authority of law given the State's Prison authorities to inflict such punishment, such regulation by the county commissioners would be void and no protection to the defendants, if it had been made.

It is true that flogging has been customary in the State's Prison, and also in the county convict camps; but that is no defense, since there is no statute authorizing it, unless such discipline is reasonable and necessary. In the absence of such stat-

ute, whether any given measure of discipline can be authorized
by those in charge of the State and county prisoners depends
upon whether the measure of discipline is reasonably necessary.
In view of the enlightenment of this age, and the progress which
has been made in prison discipline, we have no difficulty in com-
ing to the conclusion that corporal punishment by flogging is
not reasonable, and cannot be sustained. That which degrades
and embrutes a man cannot be either necessary or reasonable.

Originally, flogging was recognized as a proper punishment in
the armies and navies of the world. But it has long since been
abolished in those services.everywhere, notwithstanding the pro-
tests of officials who declared that the result would be mutiny
and disorganization. Flogging has been long since abolished as
a part of prison discipline by all the great and enlightened na-
tions of the world, except Russia. In England, France, Ger-
many, Austria, Italy, Belgium, Holland, Switzerland, Spain,
and by the government of the United States, and even in Mexico
and in most other civilized countries, the lash as an adjunct of
prison discipline has long since been forbidden. In Mexico, in
1903, Art. 385 was adopted: "The lash or any other violent
physical punishment shall not be employed" either as a sentence
of the court or as a part of prison discipline. This has been
taken substantially from the statutes obtaining in the more ad-
vanced countries.

The statute in New York provides: "No guard in any prison
shall inflict any blows whatsoever upon any prisoner, unless in
self-defense or to suppress a revolt or insurrection." Statutes
or regulations to the same effect abolishing flogging prevail in
all the northern and western States, 32 out of 48, and it is there
looked upon as a survival of barbarism. In many of the south-
ern States, as in Maryland, District of Columbia, West Vir-
ginia, Oklahoma, Tennessee, Texas, and others, it has also been
abolished and prohibited. This is one of the very few States in
which it has been retained, and here not by authority of law,
but as a matter of custom, and is the survival, doubtless, of a
former condition of society, and it has lingered here, probably,
owing to the fact that an unusually large part of our criminal
population are colored.

The growing humanity of the age demands that punishment
for crime, however justly inflicted, should be humanely admin-

istered, with due regard to the rights of the prisoner. About a century and a quarter ago, when the celebrated John Howard visited the prisons of Europe, he awoke the world to a realization of the evils inflicted upon prisoners in England, and in other countries. He found that "the prisons were for the most part pestiferous dens, overcrowded, dark, foully dirty, not only ill-ventilated, but deprived altogether of fresh air. The wretched inmates were dependent for food upon the caprice of their jailers or the charity of the benevolent; water was denied them except in the scantiest proportions; their only bedding was putrid straw. Every one in durance, whether tried or untried, was heavily ironed. All alike were subject to the rapacity of their jailers and the extortions of their fellows. Jail fees were levied ruthlessly; also a contribution was paid by each individual to a common fund to be spent by the whole body generally in drink. Idleness, drunkenness, vicious intercourse, sickness, starvation, squalor, cruelty, chains, awful depression, and everywhere culpable neglect. In these words may be summed up the state of the jails at the time of Howard's visitation. At this time prisons were primarily places of detention, not of punishment, peopled by accused persons still innocent in the eyes of the law, and debtors guilty of breaches of the financial rules of a commercial country, framed chiefly in the interest of the creditor. Freedom from arrest was guaranteed by Magna Carta, save on a criminal charge; yet thousands were committed to jail on legal fictions and retained indefinitely for costs far in excess of the original debt. The impecunious were locked up and deprived of all hope of earning means to obtain enlargement; while their families and persons dependent on them shared their imprisonment and added to the overcrowding. The prisons were always full. Jail deliveries were a rare occurrence, and even when tardy trial ended in acquittal, release was delayed until illegal charges in the way of fees had been satisfied." Encyclopedia Britannica, Art. "Prison." Our Constitution of 1868 abolished imprisonment for debt as well as all corporal punishment.

We also know from the history of those times that even in England prisoners had no allowance from the Government for food, and were indebted to the contributions of charity or to the consideration of the jailer for their daily sustenance, and that when acquitted or discharged they were detained by the jailer

till the debt for their support was liquidated by their friends. When it was proposed in Parliament that the Government should pay the jailers a salary, and should afford food for the prisoners at the public expense, a most serious and prolonged opposition was made against the incurring of such expense by the public.

Under the agitation begun by the investigations of Howard and maintained by the ability of Jeremy Bentham, a reform of prison discipline was begun which has alleviated to some extent the tyranny often inflicted upon those who were till then treated as if deprived of all rights as human beings because deprived of their personal liberty. It has been found that it is unsafe and unjust to intrust to the discretion of men, often of bad judgment and sometimes of evil passions, the infliction of corporal punishment upon helpless prisoners who, protected by no publicity and without any trial for breaches of discipline, are subjected to the arbitrary power of those in charge of them.

Further back in the so-called days of chivalry, throughout Europe every baron and lordling had beneath the lower floor of his castle a cellar into which he cast without trial, and often without food, in the mire and ooze, any one who displeased him. Their only avenger were the diseases which, rising from such pollution, often devastated the families of those on the upper floors, who spent their time in dancing and revelry while the unhappy victims, without light, often without food, were groaning in the underground receptacles, where, amid pollution and filth, they passed to miserable death. From that state of things to the condition found by John Howard was a gradation, but very far from what now obtains generally throughout civilized countries. The usual appeal for the maintenance of abuses is to the usages of the common law and of past ages, but cannot be maintained.

In 9 Cyc., 877, it is said: "A convict who violates any of the prison regulations may be subjected to solitary confinement or such other reasonable punishment as the statute may authorize (*Boone v. State,* 8 Lea (Tenn.), 739); but corporal punishment cannot lawfully be inflicted without legislative sanction. *Smith v. State,* 8 Lea (Tenn.), 744." The survival of flogging in a few of the Southern States only is doubtless due to the public attitude as to this matter which has descended to us from a former state of society. It is utterly tabooed elsewhere. Delaware and Maryland retain flogging, not as a part of prison discipline,

but as a court sentence for "wife beaters"—an admirable arrangement and a most just application of the *lex talionis.*

There can be no analogy to the corporal punishment which is sometimes inflicted on pupils in the public schools. In those cases there is the utmost publicity as a deterrent against abuse and the protection of the parent, or other relatives, of the pupil. Still less is there any analogy to the punishment of a child by its parent. In that case, besides the protection of public sentiment, there is the safeguard of natural affection. The common-law right of a husband to chastise his wife was held as late as *S. v. Rhodes,* 61 N. C., 453, where a husband was held not guilty upon a special verdict that he "whipped his wife without provocation, with a switch as large as his finger, but no larger than his thumb," citing *S. v. Black,* 60 N. C., 263, which held that if there was no permanent injury nor excessive violence, the law permitted the husband to thrash her "to make her behave herself," and that if the courts intervened it would "encourage insubordination" on the part of wives. But in 1874, in *S. v. Oliver,* 70 N. C., 60, without any intervening statute, it was held that we had "advanced beyond that barbarism." Yet the wife had the protection of the affection of her husband and of public opinion. There is no protection to prisoners in jail. They are under a cloud, and receive small sympathy from any one. The discipline is necessarily peremptory, and when punishment is inflicted by flogging, whether it is justly imposed or not rests in the bosom of the officer who orders it. There is no inquiry or publicity, either as to the justice of the punishment or of its extent as commensurate with the offense. The extent of punishment, if legal, is committed to the arbitrary power of men who may happen to be unjust, or of bad judgment. Their action is irreviewable except when in some cases of gross excess the matter may possibly be brought to public attention, and then the victim is at every disadvantage. The punishment, if by flogging, has already been inflicted, whether justly or not, and the suffering and degradation cannot be removed. The victim is usually ignorant and always impecunious and generally without friends. His fellow convicts often dare not testify in his behalf, and their testimony will not carry the weight given to statements made by those in authority. In such circumstances, abuse is easy and almost invited. And reparation is impossible when

wrong has been done. Suppose a young man of otherwise good record is sentenced in a recorder's court without a grand jury and without a jury trial for carrying a concealed weapon or for an affray or other offense not involving moral turpitude, and while in jail or on the roads he should violate some order of the prison authorities, shall he be flogged as Gallagher was, and disgraced for life? We have no decision. sustaining the right to flog prisoners to be overruled, as in the case of husband and wife, above cited.

In view of these considerations and the impolicy of subjecting men without trial, at the arbitrary will of other men, to a punishment whose effect must be to destroy the self-respect of the victim and harden and embrute him, it is no wonder that the intelligence and humanity of the age has abolished flogging, in all but a few States of this country, as any part of prison discipline. While our constitutional provision against the infliction of corporal punishment as a part of the sentence of the courts does not directly prohibit its infliction in prison discipline, its spirit is certainly against the longer use of flogging for that purpose.

The smallness of the sentence imposed in this case (a fine of $10 each and the costs) indicates that the humane and just judge who tried this cause deemed that the act of the defendants was without aggravation, and that they were only following the custom which has been observed in this State up to this time. We have been, however, discussing the legal rights of prisoners, and we find no authority for its longer continuance.

In at least two of the States, where the parole system obtains, it has been found that prisoners can be worked, with some exceptions, by humane methods which require the imposition of no punishment and by the hope of reward and by the shortening of their sentences for good conduct. In others a modification of that system has been successful. These are matters, however, which rest with the Legislature and the prison authorities.

We may note that the act of 1911, ch. 64, prescribing that persons sentenced to work on the public roads for misdemeanors shall not wear felon's stripes, is an indication that the Legislature did not intend that prisoners should be subjected to any unnecessary degradation. We are constrained to say that there is no statute or decision in this State that authorizes the infliction of flogging as a part of prison discipline, and that it is contrary

to the spirit, at least, of the constitutional provision referred to. Such being the case, we must hold that the flogging of Gallagher· was inflicted illegally and without authority of law.

No error.

HOKE, J., concurring: I concur in the disposition made of this appeal and am of opinion that the laws of North Carolina applicable to the subject do not refer the control and discipline of prisoners to the unregulated discretion of subordinate administrative officials. The general statute on the subject of working convicts on the public roads, Rev. 1905, sec. 1356, provides that "The county authorities shall have power to enact all needful rules and regulations for the successful working of convicts on the public roads," etc., and the law of 1909, the statute specially applicable to Wake County, confers like power on the authorities of that county, with the limitation that the regulations made shall be in accord with those which prevail in the State's Prison—a limitation which does not obtain unless and until the authorities of the State's Prison shall have made such rules. These statutes clearly contemplate that the control and discipline of convicts and particularly in reference to their punishment, corporal or other, shall be pursuant to rules formally made and published by the board of county commissioners, or their duly authorized agents, and I would not hesitate to hold that these rules should be humane, reasonably designed to affect the well ordered governance of convicts, and that, in their prominent features, they should be made known beforehand to each and every prisoner, that they may live and act with knowledge of the penalties attendant on disobedience. In applying such a standard, I am not prepared to say that· never, under any circumstances, is corporal punishment permissible, or that carefully prepared rules, looking to such result, are, in all instances, unlawful; but the question is not presented on this appeal, for there is no proof or suggestion that there were any rules or regulations of any kind which authorized the punishment inflicted in the present case. I am of opinion, therefore, that acts of defendants were without warrant of law and that they have been properly convicted.

WALKER, J., and BROWN, J., concurring in this opinion.