STATE v. E. W. MINCHER.

(Filed 9 November, 1916.)

**1. Indictment—Evidence—Variance.**

Where a guard is charged in an indictment for an assault with a club upon a convict, and the evidence tends to show that the assault was with a leather strap, the variance between the charge and the evidence is not fatally defective.

**2. Convicts—Assault—Excessive Punishment.**

Where a guard is charged with an assault upon a convict, and it is shown that his superior officer instructed him to take the convict over the hill away from the rest of the prisoners and give him five or six licks for refractory conduct; but that the guard used a leather strap 2½ inches wide, 2½ feet long, and ¼ inch thick, upon the prisoner's bare back, with other prisoners holding his head, legs, and feet, in the presence of the "whole crowd," and administered "fifteen or twenty licks," it is

held that the guard exceeded his authority, and the punishment inflicted was excessive and unnecessarily humiliating.

**3. Convicts—County Commissioners—Rules—Punishments.**

> It is the duty of the county commissioners to prescribe rules regulating punishment to be given refractory prisoners, stating the kind and quantum of punishment, to what breach of discipline applicable, and by whom to be inflicted, which duty they cannot delegate; and where this has not been done, their order that the road superintendent be authorized to use such means as he may deem necessary to enforce obedience cannot be construed to authorize the infliction of corporal punishment. *S. v. Nipper* cited and applied.

**4. Trials—Evidence—Ex-convicts—Questions for Jury.**

> A guard indicted for unlawfully assaulting a convict may be convicted upon testimony of ex-convicts, the weight and credibility of such evidence being for the jury.

ALLEN, J., concurring in result; CLARK, C. J., filing concurring opinion.

INDICTMENT for assault and battery, tried at May Term, 1916, of LENOIR, before *Bond, J.*

There was a verdict of guilty. The court sentenced defendant to twelve months imprisonment in the common jail of Lenoir County, not to be worked on the roads. The defendant appealed.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*G. V. Cowper for defendant.*

BROWN, J. The defendant was a convict guard of the county of Lenoir, acting under the superintendent of the road force, one Bryant Taylor. He is indicted for whipping Junius Potter, a convict. At the conclusion of all the evidence the court instructed the jury that if they found the facts to be as testified to by the witnesses, they should render a verdict of guilty. The only witness introduced by the State was Jim Benton, an ex-convict, who had served a term on the roads. He testified that while he was on the roads he saw defendant whip Junius Potter with a strap 2½ inches wide, 2½ feet long, and ¼ inch thick or more; that he was whipped on his bare back; that defendant made Potter get down and pull down his pants and had men to hold him; one held his head and one sat on his legs and one held his feet; that the "whole crowd" were present and fifteen or twenty licks were administered on the bare flesh.

The defendant was not examined as a witness, but offered evidence substantially as follows:

The superintendent of the road force, Bryant Taylor, testified that Potter would not work; that he ordered him to get a shovel and go to work, and he again refused; that this order was repeated three or four

times, and Potter still refused; that Potter's health was good and he
made no excuse that he was unable to work. In consequence of such
repeated refusals to work, witness instructed defendant to take him
over the hill away from the other convicts and strike him five or six
licks.

Dr. Parrott testified that he examined Potter that night, and found
no bruises on him; that he examined him to see if he had been whipped
too much, and found no evidence that he had been bruised; that Potter
was then suffering with a very mild type of venereal disease for which
witness treated him.

Bryant Taylor, being recalled, testified that "after Mr. Mincher had
given him the licks that I mentioned, in respect to his obeying my
requirements to work, it had great effect. We never did have to whip
him any more, for four months; he worked after then. He had been
doing mighty sorry before then. That was the only trouble that I had
had with him."

The defendant introduced the following portion of the minutes of
the county commissioners of Lenoir County for 5 October, 1914.
"Ordered: That the superintendent of the roads be and is hereby au-
thorized to use such means as he may deem necessary to enforce order
and obedience by the convict force."

Evidence was offered tending to prove that the board of commis-
sioners of Lenoir County enacted certain rules and regulations for the
punishment of refractory and unruly convicts, and that they were in
typewriting and posted in the convict camps, but no evidence whatever
is in the record as to what the regulations were. They were not re-
corded on the minutes of the board, as they should have been, and no
one seems to know anything about them.

1. The defendant contends that there was a variance between the
indictment and the proof, in that the indictment charged the assault
to have been committed with a club, whereas the proof showed the use
of a strap 2½ inches wide and ¼ of an inch thick, or more. The
defendant could not have been misled, as the person the indictment
charged him with assaulting had been on the road force, and the de-
fendant must have known that the charge against him was for unlaw-
fully flogging a convict.

In *S. v. Gould*, 90 N. C., 658, it was held that where an indictment
for murder charged that the mortal wound was inflicted with a rock,
and the proof was that the instrument used was a stick, there was no
variance. The Court said: "The bill charges that the wound was
given with a rock, and the proof rather tended to show that it was
given with a stick. It can make no difference whether the deceased

was struck with a rock or a stick; for it is held that where the instrument of death laid in the indictment and that proved are of the same nature and character, and the method of the operation is the same, though the instrument is different, there is no variance."

In *S. v. Weddington,* 103 N. C., 364, the indictment charged that the killing was done with a piece of plank, and the proof showed that it was done with a piece of iron. It was held that the variance was not necessarily fatal.

In *S. v. Speaks,* 94 N. C., 865, on an indictment charging that the killing was done with a rock, it was held that there was no error in the charge to the jury that if the killing was done with a rock or other missile, etc., and the Court emphasized the principle stated in the *Gould case,* that there is no variance when the wound is inflicted with "some other isntrument of the same nature and character when the method of the operation is the same."

2. It is contended that the court erred in the charge. We think the charge is fully warranted by the evidence. If the evidence is believed, the defendant administered an excessive and unnecessarily humiliating punishment to the convict. What credit or faith the jury should give to the evidence of the ex-convict Benton was a matter for them. It was within their prerogative to discard it entirely. Nevertheless, they acted on it and convicted the defendant.

The defendant's witness Taylor, the superintendent, testified that he instructed defendant to take Potter over the hill away from the rest of the convicts and strike him five or six licks.

The State's witness testified that the convict was made to get down and remove his clothing; that one man held his head, another sat on his legs; and another held his feet, and that defendant struck him fifteen or twenty blows with the strap on the bare flesh in the presence of the "whole crowd."

If this evidence is believed by the jury, as it seems to have been, the defendant exceeded the instructions given him by his superior, Taylor, and the punishment inflicted was excessive and unnecessarily humiliating.

In that view the defendant is guilty. There is another view in which the defendant is guilty. There is nothing in the record to prove that the board of county commissioners enacted any rules and regulations for disciplining convicts by the administration of corporal punishment. There is evidence that the board adopted some regulations, but they were not recorded and no one has testified as to their purport. The order of the board that the road superintendent be authorized to use such means as he may deem necessary to enfoce obedience by the convict force does not authorize the infliction of corporal punishment.

It is a delegation of a power which the board only can exercise and commits to the discretion of the road superintendent a very vital and important matter which must be regulated and prescribed by the commissioners themselves. It is their duty to prescribe the kind and quantum of punishment to be administered, for what breaches of discipline and by whom it is to be inflicted.

In the prevailing opinion in *S. v. Nipper,* 166 N. C., 272, *Mr. Justice Hoke* says: "These statutes clearly contemplate that the control and discipline of convicts, and particularly in reference to their punishment, corporal or other, shall be pursuant to rules formerly made and published by the board of county commissioners, or their duly authorized agents, and I would not hesitate to hold that these rules should be humane, reasonably designed to affect the well ordered goverance of convicts, and that, in their prominent features, they should be made known beforehand to each and every prisoner, that they may live and act with knowledge of the penalties attendant on disobedience. In applying such a standard, I am not prepared to say that never, under any circumstances, is corporal punishment permissible, or that carefully prepared rules looking to such result are in all instances unlawful; but the question is not presented on this appeal, for there is no proof or suggestion that there were any rules or regulations of any kind which authorized the punishment inflicted in the present case."

Since that opinion was published, the General Assembly has convened and failed to forbid corporal punishment as a means to discipline convicts sentenced to work upon the public roads of the State. The kind of punishment that may be inflicted in order to enforce obedience to discipline upon the part of convicts engaged in working the public roads of the State is a difficult problem of serious importance addressed to the wisdom of the General Assembly. The convict system of working the public roads is well established in a majority of the counties of the State, and many hundreds of miles of good roads have been constructed since it was first adopted. The convicts are necessarily worked at considerable distances from the county jail. Such jails are not equipped with dark cells and other instrumentalities for enforcing obedience employed in well regulated penitentiaries, and if they were, they are not accessible.

If the convict is returned to jail because he will not work, he accomplishes his purpose. It is what he desires, and it destroys entirely the efficiency of a sentence to hard labor upon the roads. If the convict system of working the public roads is to be maintained, some kind of summary punishment must be inflicted in order to compel the unruly convict to work and in order to enforce discipline and obedience to

authority.  If this cannot be done, the system may as well be abolished.
No error.

ALLEN, J., concurs in result.

CLARK, C. J., concurring:  Prior to the Constitution of 1868 cor-
poral punishment was allowed, such as branding for manslaughter,
cutting off the ears for perjury, and whipping and setting in the stocks
for larceny and other crimes; but in no case without the verdict of a
jury of twelve impartial men, rendered in open court, and the sentence
of a judge.  The advancing civilization of the age required that cor-
poral punishment, even in such cases and with such safeguards, should
be abolished, which was done by the Constitution, Art. XI, sec. 1.
This removed from our statute book all possibility of whipping or
other corporal punishment, even by the verdict of a jury, with the
guaranteed right of the benefit of counsel and the judgment of a court.
Certainly it could not have been contemplated that whipping should
be inflicted without a verdict, without a trial of any kind, and without
the sentence of a court.  Such punishment without a jury trial and
judgment was unknown to the law even in the most barbarous days of
the common law.  It needed no constitution and no statute to forbid
its imposition by the arbitrary act of any officer, and no statute since
has authorized the infliction of whipping, branding, or cutting off ears
in any case, and the defendant here had no right to inflict either.

Before the jury, the witness Benton testified that he saw the defend-
ant whip Junius Potter, and said: "I do not know how many licks
he struck him; I reckon he must have struck him fifteen or twenty.  He
hit him with that strap, I guess; it looks like the same thing.  The
strap did not have a handle to it.  It was a strap like this; I guess it
is the same one.  I measured it before I left there; it was 2½ inches
wide and 2½ feet long and ¼ inch thick or more.  When he struck
Junius Potter he struck him right on his bare back.  He just made
him get right down and pulled down his pants and had two men to
hold him.  I do not recall who held his head; one did, and one sat on
his legs.  I think somebody sat on his feet. . . . After he was whipped,
Junius Potter worked on that day and went back to the camp that
night.  I think it was that night that Dr. Parrott was called."

The judge after the conviction of the defendant, according to custom,
and in the proper discharge of his duties, as we have held in *S. v.
Woodlief, ante,* 887, investigated as to the general character and conduct
of the defendant in order to fit the punishment to the crime.  This
was proper and customary in order that the judge might be informed
as to the proper punishment to inflict.  Besides, the defendant has

excepted that the sentence of one year in jail is excessive, which made it necessary to send up the evidence in the record. On this investigation Benton, who was one of the prisoners at the time the defendant inflicted the whipping for which he was convicted, and who was the chief witness against him on the trial, and whose testimony must have been found to be true by the jury, testified on such examination by the judge: "I kept a little book about 2 inches wide. There is not but one more man that knew that I kept it. I toted it in my shoe; he was Frank Gray. I kept it from the 20th of July to the 13th of December, what I saw Mr. Mincher whip. Tuesday, July 20, I saw 26 whipped; and one died that night. Tuesday, the 27th, I saw 7 whipped; Monday, the 2d, I saw 7 whipped; Tuesday, August 19, I saw 13 whipped. Tuesday, the 24th, I saw 12 whipped; Tuesday, the 31st, I saw 11 whipped. September 18 I saw 22 whipped. September 25th I saw 4 whipped; the 27th I saw 11 whipped; the 29th I saw 12 whipped. October 26th I saw a woman whipped—no, sir, I didn't see that, but I heard her whipped. I guess it was Mr. Mincher did the whipping. November 2 I saw 6 whipped. Tuesday, the 6th, I saw 9 whipped. December the 13th I saw 9 whipped. The whipping was done with that leather strap, a man sitting on his head and one on his feet, and Mr. Mincher applied it. I saw a man whipped about the Clay Hole; his name was Horace White. Mr. Mincher whipped him three times before he could get away from the place he was at. . . . An ordinary whipping was always from 25 to 50 licks, looked to me like; and your Honor, there was something a-doing when that leather strap went down about 15 or 20 licks. I expect he would about raise the dead. Of course, I never got it. He never struck me, but he threatened me several times." There has been omitted above in the place marked by points ( . . . ) unprintable evidence of brutality, almost beyond conception. But it is on the record of this Court for all time without any contradiction from the defendant.

The defendant was present in court and was asked by the judge as to his weight, to which he replied that he weighed 240 lbs. The judge, of course, did not go further, but the defendant did not avail himself of the opportunity thus afforded, and the invitation by implication at least to deny any of the above allegations of brutality and gross misconduct. He contented himself merely with putting on evidence that the witness was a man of bad character. As he was a convict, it could hardly be expected that this could not easily be shown; but nevertheless he was the same witness whom the jury had believed on the trial, and the defendant did not avail himself of the opportunity to deny a single item of the testimony. He was a competent witness, and both the jury and judge found him worthy of belief.

There was another witness, one Gray, who testified also to repeated whippings inflicted by the defendant in the brutal manner that had been shown, though he had not seen as many of these whippings as the witness Benton.

It must be noted that prisoners thus committed to the custody of the law can rarely have any witnesses except themselves and their fellow convicts. They have no protection from the bad temper and the brutality of irresponsible and too often brutal officers if the law permitted the infliction of corporal punishments upon them in any case. To allow this is to authorize the officer to be judge and jury in his own case and makes him an irresponsible tyrant without restriction. There can be no more helpless beings on the earth than convicts under such circumstances.

If there is any one who needs the protection of the law it is those who are weak, for the strong are generally able to take care of themselves, and even more than the weak they need the protection of the law who have been placed in custody of the law, under the ban of public opinion and are powerless to protect themselves even against such unspeakable brutality as was inflicted on this occasion.

The State had taken from the victim of this brutal assault his liberty. He could not save himself either by flight or resistance. Had he attempted either he would instantly have been shot and killed. The State owed him protection from violence, especially from its own agents, sufficient food and clothing, and good treatment. Nothing less than this can be tolerated in the treatment of these unfortunates by a Christian, civilized people. It is probable, though it does not clearly appear in the record, that the man thus brutally treated by an agent of the State of North Carolina while in its custody and under its protection was a negro; but that is no defense. It matters not what color an African sun has printed upon him. He was a human being and entitled to the elementary rights of a man. Over the portals of our courthouses and above the judgment seat of the presiding judge the Constitution of the State has written "Equal justice to all and equality before the law."

If a horse or other dumb animal had been treated in this manner, with one man sitting on his head, another on his legs, and another on his feet, with a 240-pound man enraged, and without restraint, coming down on his naked body with a leather strap $2\frac{1}{2}$ inches wide, $2\frac{1}{2}$ feet long, and $\frac{1}{4}$ inch thick, or more, he would have been punishable by the law. Is it possible that a human being, made in the likeness of his Maker, deprived of his liberty and therefore under the protection of the law, shall be subject to such punishment, and that it is excusable because the victim was a negro?

STATE v. MINCHER.

But it is said that these men are convicts and sometimes insubordinate, and such punishment as this is necessary. "Necessity was ever the tyrant's plea." Such punishment as was here inflicted was never necessary, and to permit whipping convicts in any case is to permit it to the extent and in the manner and according to the temper and unrestricted will of the overseer, for the only witnesses are the cowed fellow convicts who fear a similar punishment at any hour. In *S. v. Nipper,* 166 N. C., 272, the victim of the flogging died within a few hours, but the only punishment inflicted was a fine of $10, because it was not shown that the severe flogging caused the death. In the present case it is in evidence that one of the other convicts thus whipped died the same night. We have no information whether that homicide has been investigated. Presumably it has been. In this very case a physician was called in that night. The victim did not die, but the punishment must have been severe, since the physician was called in.

It does not follow because of the revelation of conditions in the *Nipper case* and in this that such terrible treatment of convicts is usual in this State. On the contrary, doubtless such occasions are rare and the majority of overseers are humane men. But the fact that two such cases have come into court renders it possible that there have been others of which we have heard nothing. The fact that such cases can occur is proof conclusive that the right to flog prisoners ought not to be put in the hands of any man.

In *S. v. Nipper* some of the Court, at least, intimated very clearly that under the Constitution, as flogging was forbidden to be imposed even by the verdict of a jury and the sentence of a judge, it could not be authorized by a resolution of the board of county commissioners, and in this case there were no such resolutions. Though that case was decided two years ago, the Legislature has never thought it had the power to confer upon the county commissioners or overseers of convicts such power, for no act of that kind has been passed. It would be strange, indeed, if it had, when in nearly all other States and countries, even in Mexico and Russia, there are now statutes forbidding the corporal punishment of prisoners under any circumstances.

Nothing is more fatal to discipline in prisons than the infliction of punishment which deprives the convict of self-respect and makes him an outlaw in spirit by its injustice and brutality. Corporal punishment has not only been found unnecessary elsewhere and is strictly forbidden, but kindly treatment with reasonable and just punishment proportioned to the offense, and not inflicted at the arbitrary will of a subordinate, sometimes moved by passion, has been found more successful. In this State last Christmas the Governor gave a furlough, as a reward for good conduct, to a large number of inmates of the peni-

tentiary, and in not a single instance was his confidence abused. Convicts are men and are more moved by appeals to their better natures, and by the hope of reward for good conduct, with moderate and just punishments, only when found necessary, than by such brutalities as appear in this record.

The county commissioners of Lenoir County, 5 October, 1914, passed the following resolution: "Ordered, that the superintendent of the roads be and he is hereby authorized to use such means as he may deem necessary to enforce order and obedience by the convict force." This must mean only "such lawful means" as are necessary. The chairman of the county commissioners who was a witness for the defendant stated: "At the time we passed the resolution I guess we never thought he might take a man down and put a man on his head and one on his feet, and on his bare back put a strap like that on him." The resolution conferred no power on the defendant to inflict corporal punishment, and if it had expressly done so, it would have been invalid. There is no statute which has ever given the county commissioners the power to authorize corporal punishment, seeing that such power has been taken from the judge and jury. Sometimes young white boys, of otherwise good character, are sentenced to the roads for carrying concealed weapons, for the use of a knife or other weapon in an affray, and similar conduct. Shall one of them be subjected to flogging? Certainly the Legislature of North Carolina, in this day, will never pass an act authorizing the infliction of flogging only upon colored prisoners and only by white overseers.

When some forty years ago in S. v. Oliver, 70 N. C., 60, this Court abolished the barbarous doctrine of the common law that a husband had the "right to whip his wife with a whip no larger than his thumb," which the Court had then reaffirmed as recently as S. v. Rhodes, 61 N. C., 453, the Court needed no other authority than to say with simplicity and directness: "The courts have advanced from that barbarism until they have reached the position that the husband has no right to chastise his wife under any circumstances." Even if the common law had ever recognized the right of an official in charge of prisoners to whip them at his own pleasure and to any extent he wishes (which it never did), and if, further, the Constitution had not forbidden the infliction of such punishment even under authority of a verdict by a jury and sentence by a judge, still the Court, in response to the sentiment of a more enlightened and juster age, would need no authority further than to say, "We have advanced from that barbarism."

Both on the trial, as well as on the investigation by the judge, above set out after the verdict, the defendant thought best not to go upon the stand, though an innocent man in the face of the testimony of such

brutality could not have allowed such evidence to go down to posterity on the record without contradiction.

The Attorney-General cited *S. v. Hatch,* 116 N. C., 1003, and asked the Court to construe the responsibility of the county commissioners in a case of this kind. In this request the defendant's counsel concurred. The Court has not done so; but as the writer of that opinion, speaking for myself only, and under the authority of that case, as I understand it, and the cases citing it in the Anno. Ed., I think that if the county commissioners had given the defendant the power to inflict such punishment as this they would have been responsible both by indictment and by civil action for damages; and that if such punishment had been previously inflicted so often that by reasonable supervision the county commissioners should have heard of it, and had not removed the overseer and caused him to be prosecuted, they would have been equally responsible both by indictment and by an action for damages by the party aggrieved for willful omission and neglect of duty.

There is no evidence that by reasonable care the commissioners could have heard of the infliction of such punishments by the defendant or others. There is no reflection upon the people of the county or the people of the State, who certainly would not have tolerated such conduct. On such conduct becoming known, it has been promptly and properly punished by court and jury in this case. When there is a foul sore on the body concealment aggravates it. When it is in the conduct of government the remedy is to probe it and treat it. A sound public opinion, like the rays of the sun, cleanses and purifies.

NOTE.—Laws 1917, ch. 286, sec. 7, now forbids any prisoner to be flogged unless of the "incorrigible" class at the State prison, and then only in the presence of the State physician or chaplain.