The defendant-appellant was tried in the Special County Court of Richmond County on a warrant charging him as follows:
 "C. H. Holland on Inf. Belief, being duly sworn, complains and says that at and in said County of Richmond, Rockingham Township, on or about 11 Aug. 1948 at various other times in past 12 mts. N. L. Carpenter did unlawfully, willfully, and feloniously assault and hang Clarence Lett by his arms on the wall for seventy (70) hours in the N.C. Prison Camp #607 and did inflict cruel and unusual punishment upon him, contrary to the form of the statute and against the peace and dignity of the State."
He was convicted in that court and appealed to the Superior Court of Richmond County. When the case was called in the Superior Court and before the jury was impaneled, or entry of a plea, the defendant moved to quash the warrant and dismiss the case (a) because he had been tried in the lower court and found guilty of "cruel and unusual punishment," and there was no such crime; and (b) that the lower court did not have jurisdiction and since the jurisdiction of the Superior Court was derivative, the case should be dismissed.
The court denied this motion and defendant excepted. Thereupon the Solicitor moved to strike out the words "cruel and unusual punishment upon him," and insert in lieu thereof, "serious and painful injuries upon the person of Clarence Lett," so that the warrant should read, after the amendment, "did unlawfully, willfully, and feloniously assault and hang Clarence Lett by his arms on the wall for seventy (70) hours in the N.C. Prison Camp No. 607 and did inflict serious and painful injuries upon the person of Clarence Lett." Defendant objected to the amendment as changing the nature of the crime. The amendment was allowed and defendant excepted. *Page 231 
Clarence Lett, the prisoner upon whom the assault was alleged to have been made, testified in substance as follows:
The witness was in August, 1948, and several months previously, serving time as a prisoner in the prison camp in Richmond, a term of 18 months for a misdemeanor. Carpenter was Superintendent of the prison camp at the time he was there. Some time in August, 1948, a punishment was administered to the witness by Mr. Carpenter. The witness and other prisoners were working on the highway and ditching along the road and a beer truck came along, and the witness said, "I would like to have me a case of beer," and one of the prisoners said, "Budweiser is what you need — makes you wiser," — "and the guards loaded us up and carried us in and hung us up for it. Captain Carpenter had me hung up."
Sometime in the first of the spring Carpenter came through the mess hall of the prison camp and stated that he was making new rules and that if prisoners were caught talking on the road they were going to be hung up and punished for it. The conversation happened after he had been told that. They were carried into camp after the beer truck passed by.
The witness saw Mr. Carpenter the afternoon on which they were brought in. He came in there after Capt. Meeks had already hung the witness and others up and talked to another prisoner and hung him up. It was all for the same thing.
By being "hung up" the witness stated that "you had to stand with your hands out before you, when they were handcuffed to the bar." Standing, the hands were about even with the chest. "The bars we were handcuffed to are about like these over here in jail — regular cell bars. They are round, little ridge running down each side. They are far enough apart for you to get your arms through all the way. The handcuffs were strapped around my wrists. There was one bar between my arms. There are cross-bars to these (cell) bars. This cross-bar is a sheet of steel" — (about a thickness of a few inches) — "that runs across the bars about waist high from the floor. That's the highest bar under my arms."
"My wrists were handcuffed on the other side of the bars and I was left standing there for a certain period of time with my feet on the floor. I could take the weight of my body off my feet by pressing my arms on the cross-bar, but how long could I stand there with it on my arms? I stood there from Wednesday to Saturday and went to work Saturday morning. I worked every day after I was taken down. I could get my arms through the bars up to my elbows. I could get my elbows through the bars. I could get almost to my shoulders through the bars, — could get as far as my head and the rest of my body would let me. My arms could get through the bars until my entire body was resting against the bars but that wouldn't have anything to do with my feet. My feet did not leave *Page 232 
the floor at any time. I was not suspended at any time so that my feet were above the floor."
"I went to work on Saturday morning when the squad went out, about 7:00. I was not given any breakfast before I left. I was not released from the bars Friday night; me and Whitey Williams stood up there until Saturday morning. I was not released around eight o'clock Friday night. I did not sleep in my bunk all Friday night until I was awakened the next morning, when I was released from the cuffed position he just uncuffed me and I got my water and walked around for 15 minutes. The night watchman lets us down and sometimes Cap'n. Meeks. There are four or five different night watchmen. Cap'n. Arnett was one of them in August. He was the one that released me on Thursday at night.
"I went to work on Saturday and worked as long as any of the rest of the squad. We got in camp at 12:00. I did not make any complaint about swollen legs or feeling bad to the guards or foremen. Mr. Carpenter never put his hands on me when I was cuffed to the bars; he come through there one day and I had my foot set up on the bank and he told me if I didn't get it down he would slap it down. He did not put his hands on me at any time."
"Nobody took the trouble to examine my feet. My legs were swollen up after I was taken down two or three days. I was brought in from work on this Wednesday about three o'clock and immediately hung up right after we come in. This was the same day that the talking out on the highway took place."
Carl Holland, a witness for the State, testified that he was Sheriff of Richmond County and that he had investigated the alleged assault at the Richmond County prison camp. He had a conversation with Carpenter with respect to Lett, — the punishment administered to him. Carpenter carried him out into the cells and showed him how the punishment was administered. While talking about the indictments which had been brought against Meeks and Carpenter, Carpenter stated that Meeks had nothing to do with it; that Meeks administered the punishment under his direction.
This witness stated that he exhibited to him the prisoner at that time handcuffed to the bars; that he was in a crouched position, partially on his legs and knees.
Carpenter said that the punishment was not administered in the presence of a doctor; that he did not have a doctor unless he thought it was necessary. The floor was a cement floor.
At the close of the State's evidence the defendant demurred thereto and moved for judgment as of nonsuit, which was denied, and defendant excepted. *Page 233 
The defendant offered in evidence an authenticated copy of the "Rules and Regulations Governing the Management of Prisoners under the Control of the State Highway and Public Works Commission," and these were received as evidence and identified as defendant's Exhibit A. Excerpts therefrom are quoted infra.
The defendant Carpenter testified that he was at the time mentioned employed by the State Highway Public Works Commission, and was now so employed, in the capacity of superintendent and manager of prisoners in the Richmond County prison camp. That he was responsible for the conduct and keep of the prisoners at the camp and employed the prison guards; and had the responsibility for disciplining of prisoners. He testified that on August 11, 1948, he had occasion to impose disciplinary punishment on Clarence Lett; that Clarence Lett was assigned to the road gang working on the highway under the supervision of guards and State maintenance foremen. The prisoner Lett was sent to the camp by the guard; he was sent in at 20 minutes to 4:00 o'clock on Wednesday, August 12. As a result of the report from the guard, the witness gave orders to his steward to handcuff Lett to the bars. Witness introduced the report that he had made with reference to the incident, which report was entitled, "Grade Demotion and Punishment Report," and shows that the punishment was for "unsatisfactory work and disorderly conduct on the roads," and contained the punishment recommended with grade demotion. Witness' recommendation was "48 to 60 hours and demote to C. Grade." Below the report there was a printed form for grade demotion and the statement, "Handcuffed to bars 30 to 60 hours without food, but plenty of water. Give the prisoners a fifteen minute rest period each five hours and do not handcuff the arms above the waistline."
The witness stated that he was not present when Lett was handcuffed and did not see him; did not touch him; did not release him at any time but gave instructions to release him periodically. The witness further testified that he had given instructions to the night guards Arnett and Miles to release the prisoner every five hours for 15 minutes. The witness stated that he had seen Clarence Lett occasionally during the period he was handcuffed to the bars; that he had walked in in the morning and checked to see that all the prisoners were out of the cells and had to walk right by him. He did not recall how he was standing when he saw him.
Carpenter testified that he gave instructions to handcuff the prisoner to the bars at the time he came in at 20 minutes to four and to be "let down" at 8:00 o'clock Friday night; did see the prisoner when he was checked out to work at 7:00 o'clock Saturday morning; at 6:50 o'clock. Saw him coming out and getting into line with the rest of the road gang.
The witness testified that respecting "Rules and Regulations Governing the Management of Prisoners" that he ran his camp by that book. "I *Page 234 
mean on the discipline. The book is mailed to us from Raleigh. Copies of that book I distributed among the prisoners in the cell."
On cross-examination the witness stated that in response to the report "I had when he was sent in, I had him handcuffed to the bars within 30 or 40 minutes after he was sent into the camp. Our rules and regulations say: `Handcuff and require to remain in standing or sitting position for a reasonable period of time; period of punishment to be approved by the disciplinarian."' Witness stated that he got the approval on Saturday after the prisoner was down. "Our rule says that the man in Raleigh, who is the disciplinarian, is supposed to tell us how long we can hold a man up there. I didn't get any such permission on this occasion. I don't know why I got a report dated on the 14th from Raleigh after the man had already been sentenced and hung up and cut down. I am just superintendent of the camp. As superintendent I am supposed to know how to run it."
The following interchange of question and answer took place:
 "Q. So you didn't have any authority at the time this man was hung up there to hang him for one hour?
 "A. Only the custom of the Prison Department. It is not a written rule. It is instructions we get.
 "Q. As a matter of fact, these rules and regulations you are talking about you don't pay any attention to them at all, do you? You go by custom?
"A. In that particular case we have to.
 "Q. This report Mr. Peters showed you and you read — what is the date up there at the top?
"A. I didn't read that report. That is a different report.
"Q. This is dated down here August 14th. This is the one?
"A. Yes, sir.
"Q. And the man was hung up August 11th?
"A. Yes, sir.
 "Q. And you say now that is done by custom and not by written rule? That correct?
"A. That is the instructions I got.
"Q. Who did you get instructions from to that effect?
"A. It starts down the line from the supervisors on.
 "Q. Who instructed you to disregard the rules and regulations of the Prison Department and act on some custom?
"A. The supervisor on down to the director.
 "Q. `Period of punishment to be approved by the disciplinarian'- Now, what does that mean a Mr. Carpenter, the authority that says *Page 235 
you can handcuff a man says you must have authority from Raleigh from the disciplinarian, as to the period of time, doesn't it?
"A. Says `to be approved.'
 "I handcuffed the boy to the bars when he came in. I did not have any authority from the disciplinarian in Raleigh telling me how long this man could be hung up, not on the 12th of August. I ordered him handcuffed. It was done under my orders. I gave instructions to take him down :Friday night. I did not see him Friday night and I do not know of my own knowledge when he was taken down. The next time I saw him was in the yard Saturday morning, going to work. I did not have a doctor examine him at any time while he was up at those bars. After he was taken down the doctor came to the camp on Saturday and had the prisoners to come down if they wanted to come. He (Lett) didn't come. He was already down and had been back to work on Saturday. I did not go by to examine him to see whether he was suffering or whether his feet were swollen or anything was the matter with him. My Steward did that. I was the man in charge of the prisoners. I told the Sheriff, when Mr. Meeks was indicted, that he had nothing to do with it, that I was the man responsible. That was my opinion. I assumed full responsibility."
The witness testified that the prisoner had been released in accordance with instructions during the period of less than 60 hours.
The defendant put on certain prisoners who testified in support of defendant's claim with regard to the relief given at stated times during the period of punishment.
Owen Meeks testified that he was steward at the prison camp at the time Clarence Lett was handcuffed to the bars; that he had occasion to administer to him and let him down; that he let him down every five hours for 15 minutes at a time and then put him back to the bars; he was handcuffed to the bars Wednesday afternoon and was not taken down during that afternoon; took him down next morning, Thursday, around 7:00 o'clock. Took him down again around noon and again around five o'clock in the afternoon; saw him on Friday "and took him down the same." Witness went to work Saturday morning at 5:30; Lett had then been let down.
Kyle Matthews was offered by the defendant and testified that he was chief inspector for the Prison Department. The defendant sought to show by him what had been done with respect to minor offenses in other camps and under other superintendents. To this the State objected and the evidence was excluded. Defendant excepted. The defense also sought to show by witness Matthews what instructions he had given to the *Page 236 
defendant Carpenter respecting enforcement of the rules. The evidence was rejected on objection by the State, and defendant excepted. The jury was excused and in its absence the witness testified: "The only punishment they had to wait for approval of was corporal, that is, when you are going to use a leather strap. They had to get that approved by the Raleigh office before it was put into effect. That is provided by the rules. The other punishment is never required to be approved before the punishment was put in effect since I have been with the Prison Department. It is in accordance with the prison rules and regulations and in accordance with our training that superintendents administer punishment for minor offenses before they hear from the disciplinarian in Raleigh. We instructed all the superintendents that they did not have to wait to get the approval back from Raleigh to punish them — to punish a prisoner — for minor offenses, anything except corporal punishment — they had to wait for that. By that I mean, when you use the leather strap to whip one — that has to be approved by the Chief of the Highway Commission."
R. B. Finison was offered by the defense in the absence of the jury, who testified that he was superintendent of Montgomery County Prison Camp and had been for 15 years; that in punishing prisoners for minor offenses it was his custom to cuff them to the bars. "I have heard the description of cuffing to the bars as given this morning. That is the same thing that I do. I also report to Raleigh. I do not wait until I have the approval from Raleigh before I cuff prisoners to the bars because our instructions and our prison supervisors instruct us to go ahead and handcuff them to the bars and state the rules to Mr. Honeycutt, and it has always been approved."
On cross-examination he said he handcuffed prisoners to the bars in his camp and did not get the approval of the disciplinarian before he did that. "It has always been approved. Sometimes it comes in later and sometimes earlier. We write them up. When a man is brought in from the road for breaking the rules we decide on what kind of punishment he should have. Then I give it to him and at the same time I write it up and send it in to Raleigh to Mr. Honeycutt."
The witness further testified: "The disciplinarian has never failed to approve a punishment for me. I have not hung them to the bars for as long as sixty hours. I wouldn't say how long is the longest I ever had one fastened up — I never had one up that long. I would not consider that cruel and unusual punishment if he deserves it; some of them that don't have any effect on. I haven't had one up sixty hours. I have had them in the dark hole longer than that. I don't remember how long is the longest period I have had a prisoner cuffed to the bars." *Page 237 
S. P. Helms, superintendent of Union County Prison Camp, was offered in the absence of the jury and testified to the same effect. He stated that for minor offenses he had administered the punishment as described in the evidence and without waiting for approval of the disciplinarian. That it had always been approved. The longest that he had ever hung a man, he thought, was 60 hours.
The jury was returned and all this evidence was excluded.
From defendant's Exhibit A, that is, The Rules and Regulations Governing the Management of Prisoners under the Control of the State Highway and Public Works Commission, adopted by the Commission at its meeting of September 26, 1945, was introduced under the heading "Punishment and Discipline," the following:
 "(a) The superintendent, warden, or the officer next in authority designated by the superintendent or warden in his absence, will be permitted to administer such punishment as herein provided
"(b) For Minor Offenses: . . .
 "Handcuff and require to remain in standing or sitting position for a reasonable period of time. Period of punishment to be approved by Disciplinarian.
"(c) For Major Offenses:
"1 — Reduction in grade.
"2 — Place the prisoner in shackles.
 "3 — Restricted diet and solitary confinement. Period of punishment to be approved by the Disciplinarian.
 "4 — Additional time to the minimum sentence for a prisoner serving indeterminate sentence.
 "5 — Corporal punishment, with the approval of the Chairman of the State Highway and Public Works Commission, administered with a leather strap of the approved type and by some prison officer other than the person in immediate charge of said prisoner and only after physical examination by a competent physician and such punishment must be administered either in the presence of a prison physician or a prison chaplain."
Reprint of the other exhibits is not relevant to the decision.
At the close of all the evidence defendant renewed the motion for judgment as of nonsuit, which was denied. The defendant then moved for a directed verdict of not guilty, which was denied, and defendant excepted.
Exceptions to the Judge's charge pertinent to the decision will be found in the opinion. *Page 238 
The case was submitted to the jury and resulted in a verdict of guilty. The defendant moved to set the verdict aside for errors committed on the trial. The motion was denied, and defendant excepted.
To the ensuing sentence the defendant objected, excepted and appealed, assigning errors.
The rules and regulations adopted by the State Highway and Public Works Commission for the control and discipline of prisoners committed to its custody and intended for the guidance of those who have their immediate control cannot confer upon the latter immunity for disciplinary acts which would otherwise be offensive to the criminal law, unless the particular regulation, per se, is within the authority of the statute relied upon, and the statute itself not violative of the provisions of the Constitution. Section 148-11 of the General Statutes, on which the appellant claims authority for the disciplinary measures taken, reads as follows:
 "The state highway and public works commission may adopt such rules and regulations for enforcing discipline as their judgment may indicate, not inconsistent with the constitution and laws of the state. They shall print and post these regulations in the cells of the convicts, and the same shall be read to every convict in the state prison when received."
This statute is supplemented in appellant's brief by G.S. 148-20, reading as follows:
 "It is unlawful for the state highway and public works commission to whip or flog, or have whipped or flogged, any prisoner committed to their charge until twenty-four hours after the report of the offense or disobedience, and only then in the presence of the prison physician or prison chaplain; and no prisoner other than those of the third class as defined in this article shall be whipped or flogged at any time."
S. v. Nipper, 166 N.C. 272, 81 S.E. 164, furnishes a complete background of the law as it stands at present, (G.S. 148-20). The constitutionality of the statute (G.S. 148-11) was upheld in S. v. Revis, 193 N.C. 192,136 S.E. 346, in an opinion by Chief Justice Stacy which touches *Page 239 
practically every phase of the question now before us. But to render lawful any corporal punishment directly provided for in the act or by analogy supposed to be within the authority of the rules and regulations provided for in the preceding section, G.S. 148-11, that sort of discipline must be within the rule of reason contemplated by the statute; and excessive punishment may deprive the perpetrator of its protection. S. v. Mincher, 172 N.C. 895, 90 S.E. 429.
It should be made clear that if the Commission has, under the supposed authority of the statute, adopted rules for discipline of prisoners by punishment or corrective measures not within its purview, the principle of regard for administrative interpretation evidenced by practice will not control, and the fact that the defendant may have supposed himself to be within the performance of a regimented duty is not a defense.
In a fair consideration of this case we must take note of the fact that prison discipline in this country has been developed in an atmosphere of sterner justice through the courts than that which now prevails, and has taken on that flavor. But during the years both the courts and the executive administration of its edicts have been greatly mollified by more modern, if not more effectual philosophy respecting crime and its punishment; and we have finally come to the point where it has become a question for the humanitarians, (and we all wishfully, at least, belong to that class), the criminologists, and experienced officials working in the field of prison control as to what manner and degree of discipline is best suited for the purposes of the criminal law, and may with propriety and observance of the humanities be applied. The passage between Scylla and Charybdis has not been free from conflicting storms of acrimonious criticism.
We certainly have not time or space in this opinion for any dissertation on the ultimate purpose of enforcing the criminal law, — whether for the punishment of the crime or the reform of the prisoner. Conceding it to be both, it is obvious, we think, that neither philosophy would be best served by permitting open rebellion or insolence, or such disobedience to the custodial will as would nullify the mandate of the Court, breed disrespect for the law and contempt for those who must enforce it.
With the Court itself which tries the accused and determines his guilt and attempts to measure the debt which he owes to society, as well as whether the debtor may, in some respects, be salvaged from his antisocial behavior, the task is more practical than theoretical. Humanitarian considerations, as far as the Court may consider them, (and there is no other phase of the judge's duty that is so difficult and usually so conscientiously faced), these are reflected in the judgment rendered, often leading to probation, many judges no doubt properly thinking the penitentiary or prison is a poor college from which to graduate the *Page 240 
subsequent citizen. The duty of the Court, however, ends with the judgment; and we come to the very practical question which boils up to the top of the pot in cases like these: What rights does a prisoner of the law retain when the sentence of the Court is announced and he is inducted into his new station or status; and what rights has he surrendered to society?
In the first place it is clear that his status is not expressly fixed by the judgment of the Court, — that does not reach forward and minutely detail his treatment in his new station; there is something over when the sentence is imprisonment, or imprisonment "at hard labor." Human elements are to be dealt with, — the things which custodians may or may not do to him. Some of them are necessarily implied in the sentence and incident thereto; and some of them must be in accord, to some extent, with the prevailing mores of the people who stand back of the law.
We observe in the first place that as a matter of conclusive inference, the prisoner has, with the temporary surrender of his corporal freedom, also parted with some of those rights and liberties that are pertinent to the free civilian in exercising his will as he may desire. The sentence to imprisonment at hard labor carries with it more than a mere willingness on the part of the prisoner to comply with these conditions. A want of willingness must be supplied by reasonable encouragement, or corrective measures. All of them are imposed upon him in invitum; and he has surrendered those rights of free choice and action which must of necessity be abridged in order that the mandate of the Court may be carried out effectively.
In the second place he has forfeited his free choice of conduct, of engaging in practices calculated to destroy the order and effectiveness of the institution to which he has been committed. We all agree to this.
But, in all cases where the rule of reason is the important factor or coefficient of action, there is an extensive area in which there are no sharply drawn lines leading to easy definition; instead a twilight zone, on one side of which conduct may not be challenged as other than lawful or innocent, and on the other is clearly nocuous. Even the discretionary power of the judge, ordinarily unreviewable, may come within appellate correction because of its abuse.
We cannot, therefore, accept the theory suggested by the defense that because the mode of punishment meted out to the prisoner was specified in the regulations, it was, therefore, necessarily lawful. The manner of its application as testified to by the prisoner, the extent to which it was carried, the period during which it continued, the want of attention during that time, taken in connection with the lack of food and water, and rest from a position intended to inflict discomfort, and which unreasonably protracted was calculated to produce serious injury, — we cannot say that these did not go beyond the rule of reason and render its *Page 241 
perpetrator liable to the law. Fifty or sixty hours of such treatment in the manner disclosed by the State's evidence might well raise the question whether the Creator has fashioned the human frame to withstand serious consequences to bone and sinew, not to mention that central nervous complex at the receiving end of pain and misery.
We express no approval of the regulation immediately concerned or the mode of its enforcement, and we think the conception of the treatment given the prisoner as not being "corporal punishment" is neither dictionary-wise nor penologically-sound. Why an ex post facto approval of the punishment inflicted should be required, or what effect it is supposed to accomplish does not appear. In so far as the disciplinee is concerned it is Lydford law.
It is unfortunate that the defense of the superintendent charged with the violation of the law resolves itself into a defense of the system, of the regulations and administrational practices which it is contended justify in law the excesses exemplified in the punishment inflicted on the Prisoner Lett as detailed in the State's evidence. Since these rules and regulations have been put in evidence as exculpatory of the defendant, and evidence of official character offered to show that practices similar to that with which we are now dealing are common in prison camps throughout the State, it becomes necessary for us to say that however these disclosures may be received in nonjudicial circles, we find them so inconsistent with the rule of reason contemplated in the statute and so repugnant to natural Justice that we cannot regard them as conferring any immunity on the defendant in the instant case.
The original warrant on which the defendant was tried in the recorder's court charged an "assault attended with cruel and unusual punishment." In the Superior Court from which this appeal comes, the Solicitor moved to amend the warrant to have the charge read "inflicting serious injury." This was allowed over the defendant's objection and exception. Conceding that an amendment to the warrant completely changing the offense with which the defendant was charged could not be made, the nature of the amendment does not present a violation of the rule. The descriptive matter supplied is merely in aggravation of the assault. That might in certain instances have a jurisdictional bearing; but not here. The Special County Court of Richmond County was created under the general law, now G.S. 7-405, et seq.; and by G.S. 7-435 all criminal offenses under the grade of felonies have been declared petty misdemeanors respecting the jurisdiction of the courts. G.S. 7-435; S. v. Shine, 222 N.C. 237,22 S.E.2d 447; S. v. Camby. 209 N.C. 50, 182 S.E. 715; S. v. Hyman164 N.C. 411, 79 S.E. 284. The amendment, permissible in the County Court, was properly made in the Superior Court. G.S. 7-149, Rule 12; *Page 242 
S. v. Brown, 225 N.C. 22, 23 S.E.2d 121; S. v. Wilson, 221 N.C. 365,20 S.E.2d 273; S. v. Holt, 195 N.C. 240, 141 S.E. 585.
It follows that the motion to quash the warrant and the motion for arrest of judgment are without merit. Demurrers to the evidence were properly overruled.
But we think that while the trial judge was justified in submitting the evidence to the jury, she suffered a casualty in giving to the jury the following instruction:
 "If you do not believe the evidence of the defendant beyond a reasonable doubt, then in that event only, would you return a verdict of not guilty."
The instruction is doubtless based on the theory that the defendant, as witness in his own behalf, had made such admissions as would have to be discounted, or unbelieved, before his acquittal could be had.
However this process may enter into and direct our thinking, the Court has never, we believe, approved the formula or passed favorably on an emphasis of this sort on the evidence of the defendant alone, or even the testimony of the defendant himself, as bearing so critically on the single issue verdict of guilt or innocence. The negative manner of the statement was calculated to confuse the jury on the necessity of conviction beyond a reasonable doubt on consideration of the whole evidence before they could find the accused guilty, and must be held for error.
We do not wish it understood that the Court approves all the instructions to which the appellant has directed exceptions. We do not find it necessary to enter into a maze of discussion which may not be helpful on a new trial, and do not find it necessary to decision to consider other exceptions in the record.
For the error indicated the defendant is entitled to a new trial. It is so ordered.
Error. New trial.