DEBRA WATSON, Administratrix of CHARLES EUGENE WATSON, JR., Deceased (Docket TA-5894), ROGER DALE WYATT (Docket TA-5757), ELZENA WALKER, Administratrix of ARCHIE LEE WILLIAMS, Deceased (Docket TA-5766), RICKEY SHUMATE, (Docket TA-5775), CARL MOODY, (Docket TA-5797), BRENDA RICE, Administratrix of DAVID RICE, Deceased (Docket TA-5930), SAMMY RAY PORTER (Docket TA-5774), JAMES DAVID CARPENTER (Docket TA-5779), MARION D. WESLEY, Administratrix of RONALD DENNY (Docket TA-5876), QUENTIN MAURICE LUCAS (Docket TA-5855), DAVID HORNE (Docket TA-5820), FREDDIE B. LEWIS (Docket TA-5771), FRANK J. HAMMONDS (Docket TA-5773), HENRY CARSON REECE (Docket TA-5772) and WILLIAM M. JORDAN (Docket TA-5780) v. NORTH CAROLINA DEPARTMENT OF CORRECTION

No. 7910IC188

(Filed 5 August 1980)

1. **Convicts and Prisoners § 3; State § 8.3– injuries to prison inmates in fire – use of polyurethane mattresses – no negligence by Deputy Director of Prisons**

In a tort claim action to recover for deaths and injuries to prison inmates in a fire which occurred when inmates, in furtherance of an escape attempt, set fire to several mattresses piled on and around a table in a prison dormitory, the Deputy Director of Prisons was not negligent in placing inmates in a prison dormitory with polyurethane mattresses when he knew that the mattresses were combustible when continuously exposed to a combustion source since it was not foreseeable that the inmates would pile mattresses on and around a table and then provide the combustion which would cause them to burn rapidly.

2. **Convicts and Prisoners § 3; State § 8.3– injuries to prison inmates in fire – no negligence by lieutenant and sergeant**

In a tort claim action to recover for deaths and injuries to prison inmates in a fire which occurred when inmates set fire to several mattresses piled on and around a table in a prison dormitory, plaintiffs' evidence was insufficient to show negligence on the part of the lieutenant or the sergeant at the prison unit where it tended to show that the inmates planned an escape by starting a fire and rushing the guards when they came in to put it out; debris was placed under a picnic table and ignited; the sergeant called the lieutenant to come to the dormitory because of a disturbance and gave him the dormitory keys; the lieutenant and sergeant saw smoke in the dormitory but did not see any flame; mattresses on the table were not near the smoke; the lieutenant told the inmates to put out the fire and was told that if he wanted the fire out to come in and put it out; both the lieutenant and the sergeant feared the fire had been started as part of an escape plan; the lieutenant, sergeant and three guards in the dormitory did not have guns; the lieutenant told the inmates that if they would not put out the fire he would go and get help; the lieutenant directed the sergeant to man the tower; the sergeant opened the safe in his station to obtain guns and other riot equipment but did

not obtain the keys from the lieutenant for the emergency doors; after the officers left the dormitory, inmates began throwing mattresses on and around the table, and one of their number ignited the mattresses; the lieutenant telephoned his supervisor, and his call was interrupted by a guard's call for help advising that the place was on fire; the lieutenant and sergeant ran back to the dormitory, and the lieutenant gave the keys to the sergeant, telling him to get the inmates out and that he would go man the tower; the lieutenant went to the tower and called the sheriff's department for assistance; the fire raged out of control within a very few minutes; the key to the emergency door would not work because glass had fallen into the lock; the sergeant then opened the dormitory door and yelled for the inmates to come out; and previous fires at the unit, including those involving polyurethane mattresses such as those used on the date in question, had been put out by inmates or prison personnel with water or by separating the burning material from the flame.

APPEAL by plaintiffs and defendant from a decision and order of the North Carolina Industrial Commission filed 24 October 1978. Heard in the Court of Appeals 22 October 1979.

These are actions brought under the provisions of G.S. 143-291 *et seq.*, the Tort Claims Act. The actions were consolidated for hearing before the Industrial Commission. Separate opinions were issued, and separate appeals were taken to the full Commission. The actions have been consolidated for appellate review. All of the actions arose from a fire at the McDowell County Prison Unit of the Department of Correction near Marion, North Carolina. The fire occurred on the evening of 30 June 1976, when inmates, in furtherance of an escape attempt, set fire to several mattresses piled on a table in B Dormitory at the Prison. The hearing examiner found negligence on the part of the prison officials, allowed recovery for some of the plaintiffs and denied recovery to others on the basis of contributory negligence. The full Commission reversed the finding of negligence on the part of the Deputy Director, but concurred in the finding of negligence on the part of the Lieutenant and Sergeant, and concluded that all plaintiffs were guilty of contributory negligence, thus denying recovery to all plaintiffs. One commissioner dissented.

The findings of fact of the hearing examiner were adopted in toto by the full Commission, and those which are pertinent to these appeals are discussed in the opinion. The findings are

identical in all cases except that in those cases in which the hearing examiner denied recovery, findings with respect to contributory negligence were added.

For clarity, the record on appeal is divided into Group A and Group B. Group A is composed of the plaintiffs who were allowed recovery by the hearing examiner and Group B is composed of plaintiffs who were denied recovery. We have found that characterization of the two groups helpful.

All plaintiffs appealed from the decision and order of the Commission, and the appellee has set out exceptions and cross assignments of error.

*Attorney General Edmisten, by Sandra M. King, Assistant Attorney General, and Russell and Greene, by J. William Russell, for North Carolina Department of Correction, appellee.*

*Robert H. West, for Rickey Shumate, Carl Moody, Sammy Ray Porter, James David Carpenter, Freddie E. Lewis, Frank J. Hammonds, Henry Carson Reece, and William M. Jordan, appellants.*

*Wilson and Palmer, by Bruce L. Cannon, for Debra Watson, Administratrix of Charles Eugene Watson, appellant.*

*Goldsmith and Goldsmith, by C. Frank Goldsmith, Jr., for Elzena Walker, Administratrix of the Estate of Archie Lee Williams, appellant.*

*S. Thomas Walton, for Roger Dale Wyatt and Brenda Rice, Administratrix of David Rice, appellants.*

*R. Lewis Ray for David Horne, appellant.*

*Alvis A. Lee, for Quentin Maurice Lucas and Marion D. Wesley, Administratrix of Ronald Denny, appellants.*

MORRIS, Chief Judge.

[1] Plaintiff appellants first assign error to the Commission's striking Deputy Commissioner Denson's conclusion of law No. 3, which concluded that Deputy Director of Prisons, W.L. Kautzky was negligent "in that he improperly maintained polyurethane mattresses in the Unit which he knew were highly inflammable and presented a hazard to anyone exposed to a burning mattress, when he could reasonably foresee that fires would be intentionally set by inmates to those mattresses", contending that the greater weight of the evidence reveals negligence as a matter of law. Plaintiffs did not except to any finding of fact except those findings of contributory negligence with respect to each plaintiff in Group B.

This tragic occurrence took place on 30 June 1976, and the claims were filed at various times in 1976 and 1977. At all times pertinent to these claims, under the provisions of G.S. 143-291, the Industrial Commission, which was constituted a court to hear and pass upon tort claims against departments, institutions, and agencies of the State, was given the responsibility of determining whether the claim before it "arose as a result of a negligent act of any officer, employee, involuntary servant or agent of the State while acting within the scope of his office, employment, service, agency or authority, under circumstances where the State of North Carolina, if a private person, would be liable to the claimant in accordance with the laws of North Carolina." Effective 1 July 1979, the section was amended to require the Commission to determine whether the claim "arose as a result of the negligence of any officer, employee, involuntary servant or agent of the State ..." We are not concerned with the amended statute, which obviously enlarges the rights of persons seeking to recover for injuries resulting from State employees' negligence.

The right of prisoners to seek recovery under the Tort Claims Act is established in *Ivey v. North Carolina Prison Dept.*, 252 N.C. 615, 114 S.E. 2d 812 (1960).

In *Mackey v. Highway Comm.*, 4 N.C. App. 630, 167 S.E. 2d 524 (1969), plaintiff sought to recover for injuries sustained when she stepped in a hole on the shoulder of the State highway. She alleged that her injury was caused solely and prox-

imately by the negligent conduct of a named employee in removing large posts which had been placed along the shoulder of the highway, leaving unfilled holes, into one of which she stepped and was injured. In holding that the creation of a hole was a negligent act, and not a negligent omission, we said:

> Under the State Tort Claims Act recovery is permitted for injuries resulting from a *negligent act*, but not those resulting from a *negligent omission* on the part of State employees. G.S. 143-291; *Flynn v. Highway Commission*, 244 N.C. 617, 94 S.E. 2d 571. In *Flynn* the claim denied was based upon the alleged negligent failure of named employees of the State to repair a hole or break in the surface of a State road *caused by public travel over it.* "In order to authorize the payment of compensation, the Industrial Commission's findings must include (1) a negligent act, (2) on the part of a State employee, (3) while acting in the scope of his employment, etc. The first requirement is that the claimant show a *negligent act.* Is a failure to repair a hole in the highway caused by ordinary public travel a negligent act? The requirement of the statute is not met by showing negligence, for negligence may consist of an act or an omission. Failure to act is not an act." *Flynn v. Highway Commission, supra.*

4 N.C. App. at 633, 167 S.E. 2d at 526. The statement in *Flynn* accurately reflected the law at the time these plaintiffs received their injuries. *See also Midgett v. Highway Commission*, 265 N.C. 373, 144 S.E. 2d 121 (1965) (failure to keep highway drains free of sand and debris); *Etheridge v. Graham*, 14 N.C. App. 551, 188 S.E. 2d 551 (1972) (allegations that damages resulted from the failure of the Commissioner to perform certain duties).

Since the Tort Claims Act is in derogation of sovereign immunity from liability for torts, it must be strictly construed with strict adherence to its terms, *Floyd v. Highway Commission*, 241 N.C. 461, 85 S.E. 2d 703 (1955). Thus the allegations that the injuries resulted from the failure of Deputy Director Kautzky to replace the petroleum based product mattresses with cotton mattresses do not bring these claims within the purview of the Tort Claims Act.

Although the allegations in the affidavits were couched in language indicating negligent acts of omission, Commissioner Denson, in her conclusion of law No. 3, used language indicating negligent acts of commission when she concluded that "Mr. Kautzky was negligent in that he improperly maintained polyurethane mattresses in the Unit which he knew were highly inflammable and presented a hazard to anyone exposed to a burning mattress, when he could reasonably foresee that fires would be intentionally set by inmates to those mattresses."

In *Lawson v. Highway Commission*, 248 N.C. 276, 103 S.E. 2d 366 (1958), the allegations were that the employee of the State "was negligent in not ascertaining that the prisoners under his supervision could work in safety, he having knowledge that electric wires were down in the vicinity in which they were working; that his negligence in not calling the power companies and requesting them to switch the electricity from the wires which were down was the proximate cause of the death of Cleo Lawson, without contributory negligence on the part of plaintiff. ..." To defendant's argument that the negligence, if any, consisted of omission, not acts, the Court, speaking through Bobbitt, J. (later C.J.), said:

> While the findings of fact established Barefoot's negligent failure to ascertain whether the prisoners under his supervision could work in safety in the area to which he assigned them, his omissions in this respect constituted the circumstances under which he acted, not the cause of Lawson's death. The basis of plaintiff's claim is Barefoot's act, in the light of such circumstances, in putting the prisoners, including Lawson, to work in an area of hidden danger when he should have reasonably foreseen that they might and probably would unwittingly come in contact with a live wire. In our view, the findings support the Commission's composite conclusion of fact and law, set forth in its Conclusions of Law, that the negligence of Barefoot was the proximate cause of Lawson's death.

> *Greene v. Board of Education*, 237 N.C. 336, 75 S.E. 2d 129, and *Lyon & Sons v. Board of Education*, 238 N.C. 24, 76 S.E. 2d 553, involved proceedings under G.S. 143-291 et seq.,

where injury was inflicted by the negligent operation of a school bus. In each, plaintiff recovered. The driver's failure to exercise due care to observe the child in front of the bus (*Greene* case) or the [sic] automobile behind the bus (*Lyon* case) did not proximately cause the injury or damage. The fact that the driver operated the bus under such circumstances was the negligent act that proximately caused the injury or damage.

248 N.C. at p. 281, 103 S.E. 2d at p. 370.

In *Spicer v. Williamson*, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926), Justice Connor said: "The prisoner by his arrest is deprived of his liberty for the protection of the public; it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." The duty of the State to its prisoners was stated thusly by Justice Clark, in his concurring opinion in *State v. Mincher*, 172 N.C. 895, 902, 90 S.E. 429, 432 (1916), "The State owed him protection from violence, especially from its own agents, sufficient food and clothing, and good treatment."

If Deputy Director Kautzky, acting for the State, negligently violated the duty of the State to furnish its prisoners protection from violence, or if Mr. Kautzky placed prisoners "in a place of known danger where injury would probably result", *Gordon v. Highway Commission*, 250 N.C. 645, 647, 109 S.E. 2d 376, 378 (1959), then the State should respond in damages to one whose injuries proximately result from that negligent violation. Deputy Commissioner Denson concluded that the Deputy Director was negligent in allowing polyurethane mattresses, "which he knew are highly inflammable", to be used in Dormitory B, and that this negligence was a proximate cause of the injuries to the plaintiffs. We do not agree and are of the opinion that the full Commission properly struck this conclusion.

The evidence is clear and uncontradicted that Mr. Kautzky knew the polyurethane mattresses were combustible. Indeed, he had recommended that the Department request the General Assembly to appropriate sufficient funds to replace that type of mattress with flame retardant cotton mattresses. It is uncon-

Watson v. Dept. of Correction

tradicted that he knew that there had been other fires in various units when these mattresses were burned. He testified that he did not know they were very flammable, but he had conducted tests which proved that "when the mattress was continuously exposed to a combustion source" it would be completely consumed in flames in about three minutes. "However, if you remove the source of combustion, it would immediately go out" and would not burn. To charge Mr. Kautzky with the duty of foreseeing that the use of polyurethane mattresses would result in a conflagration such as happened here is requiring more of him than the law does or should require.

We must apply the rules of common law negligence. By these rules, the duty owed is ordinary care under the circumstances. Whether a person so acts is to be determined upon the facts as they appeared at the time and not by a judgment from the actual consequences which were not then to be apprehended by an ordinarily prudent person. *Williams v. Boulerice*, 268 N.C. 62, 149 S.E. 2d 590 (1966). In order for negligence to be actionable, it must be tested by the *reasonable* foreseeability of an event which might have resulted in injury and exists where there is a failure to guard against a *reasonably* to be expected danger. The law does not require prescience — merely reasonable foreseeability.

Tested by these well-established principles, we are convinced that the placing of inmates in Dormitory B with polyurethane mattresses on the bunks was not an act from which Mr. Kautzky could have and should have foreseen that the inmates would pile mattresses on and around a table and then provide the combustion which would cause them to burn rapidly. We are of the opinion that the injuries to plaintiffs were so unforeseeable that reasonable minds could not differ thereon, and the Commission properly struck the Deputy Commissioner's conclusion of law No. 3.

[2] By cross assignments of error Nos. 9 and 10, defendant urges that the Commission erred in adopting as its own the Deputy Commissioner's conclusions of law Nos. 4 and 5 by which the Deputy Commissioner concluded, on facts found, that Lt. Wilson and Sgt. Macopson were negligent in the respects set out in the order as follows:

4. Lt. Wilson was negligent in his improper response to the situation with which he was presented when he was called to the dormitory. Such negligence occurred in the following specifics:

> (a) The Lieutenant took with him the keys, effectively closing the prisoners inside the cellblock with a fire, when he could reasonably foresee that the fire could develop and become life-threatening.

> (b) The Lieutenant ordered the Sergeant to come with him when, as chief custodial officer at the Unit, the Sergeant's responsibility was to remain in the corridor and see to the safety of the inmates.

> (c) The Lieutenant's action in making telephone calls to superior officers was an improper response to the situation with which he had been presented. The proper response was obviously to call the Sheriff's Department and ask for help.

At the time the Lieutenant left the dormitory, he was not confronted with a sudden emergency and cannot avail himself of that doctrine to require a lesser degree of care.

Such negligence as herein specified of Lt. Wilson was a proximate cause of the injury sustained by the plaintiff and was not intervened nor insulated by subsequent negligence of any person.

5. Sgt. Macopson was negligent in the following respects:

> (a) He improperly exercised his primary duty to supervise the inmates for their safekeeping and safety in that he failed to request the keys from the Lieutenant and he left the corridor rather than remain and supervise the custody situation.

> (b) The Sergeant's actions at the Sergeant's Station were inappropriate. Rather than secure the emergency door keys and the fire extinguisher, he secured the

keys to the gun locker in order to get weapons and riot equipment.

At the time the Sergeant left the dormitory, he was not confronted with a sudden emergency and cannot avail himself of that doctrine to require a lesser degree of care.

Such negligence as herein specified by Sgt. Macopson was a proximate cause of the injury sustained by the plaintiff and was not intervened nor insulated by subsequent negligence of any person.

From the findings of fact, the following sequence of events appears: there were five employees at the Unit the night of the fire: Lt. Wilson, Sgt. Macopson, and three guards, Mr. Brooks, Mr. Buckner, and Mr. Cox. The Unit had one dormitory building which housed A and B dormitories and B Dormitory at that time housed 33 inmates. During the afternoon of 30 June 1976, Sgt. Macopson and Mr. Buckner went into B Dormitory to confiscate radios because some inmates had been playing them without using earphones. One inmate smashed his radio rather than turning it over to the authorities. Afer the evening meal, the inmates discussed the course they should follow to protest. The leader asked all inmates to refuse to undress and go to bed at 10:00 p.m. After that meeting, a group of inmates met, hidden from the view of the guards, planned an escape. The plan was to start a fire and rush the guards when they came in to put it out. About 7:30, this plan was initiated. Some debris was placed under a picnic table at a position farthest from the bars. It was ignited. Guards Brooks and Buckner saw the smoke, and Mr. Brooks called Sgt. Macopson. He told the Sergeant that the inmates were piling mattresses on the table and that there was going to be trouble. Sgt. Macopson responded to the call and saw three mattresses on the table. He turned toward the inmates and looked at them, whereupon two of the inmates removed their mattresses. The Sergeant called Lt. Wilson, who was working in the Superintendent's office, and told him he thought there would be trouble because the inmates had started a little fire. The Sergeant went to the locked gate and let the Lieutenant in the fenced-in area of the compound and handed the Lieutenant his keys, including the key to the two dormi-

tories. After pulling the plug on the television sets so the noise would not interfere, Lt. Wilson motioned for the inmates to come to the bars. At his second request, most of the inmates came to the front. The Lieutenant and Sergeant sensed a tenseness among the inmates. The inmates who came to the front listened to the Lieutenant. Those who did not come could not be seen. The leader of the inmates related their grievances and the Lieutenant told him the actions by the inmates were not the proper and appropriate way to settle their problems. The Lieutenant and the Sergeant saw the smoke but did not see any flame, although Mr. Buckner, who was standing where he could look around the inmates, did see a flame. Any mattresses on the table were at the front of the table and not near the flame or the smoke. Lt. Wilson told the inmates to put out the fire. The response was that if he wanted the fire out to come in and put it out. This was, of course, in keeping with the escape plan. Although there was a fire extinguisher in the corridor, no inmate asked for it. Both the Lieutenant and Sergeant understood or feared that the fire which had been started was a part of an escape plan. The Lieutenant told the inmates that if they would not put out the fire, he would go and get help. He directed the Sergeant to come man the towers and the Sergeant ordered Mr. Buckner to come help. Lt. Wilson had the keys and they went to the Sergeant's station. After they left an inmate, Joe Bright, said "let's burn this m---- f---- down!"[1] The Sergeant opened the safe in his station containing guns and other riot equipment. He did not get the keys to the emergency doors at that time. The Lieutenant attempted to contact his immediate supervisor by phone. He was not successful, and he then telephoned the next superior officer. Their conversation was interrupted by Mr. Brook's call for help advising that the place was going up. It was then that they ran back to the dorm. Lieutenant handed the keys to the Sergeant telling him to get the inmates out and that he would go man the tower. The Lieutenant went to the tower near the visitor's gate and from there

---

1. The findings of fact do not indicate at what time this statement was made, but the evidence is clear that it was after the officers left without falling victims to the escape plan, a turn of events which angered the inmates, and they began wildly throwing mattresses on and around the table, after which one of their number ignited the mattresses.

called the Sheriff's Department and asked for them to send the necessary assistance. The fire raged out of control within a very few minutes. The key to the emergency room door would not work because glass had fallen into the lock and obstructed its opening. When the Sergeant ran in to open the doors he had the key to Dormitory A in his hand, opened that first, ran back out to get a breath of air, returned and opened the door to B Dormitory and yelled for the inmates to come out. The rules and regulations required that the persons manning the towers be armed. The Guidebook (regulations) of the defendant contained the following instructions with respect to emergencies:

> *Alarms* — The officer in charge of the prison shall be notified as soon as an emergency develops. This notification shall be given by the most direct method available, but caution should be exercised to prevent disturbing inmates in other areas. The officer in charge shall take immediate steps to activate the appropriate established plan without waiting to contact higher ranking officials; however, if Prison Department Headquarters can be notified immediately about a major emergency, this shall be done before local law enforcement agencies are notified.
>
> As soon as possible, the immediate superior of the officer in charge of the prison shall be notified. This officer shall determine whether the situation warrants the immediate notification of higher ranking officials in the chain of command. In all cases where the officer in charge of the prison is unable to make contact with his immediate superior soon after an emergency develops, the next officer in the chain of command shall be notified.

Previous fires at the Unit, even those involving polyurethane mattresses, had been put out by the inmates or prison personnel with water or by separating the burning material from the flame.

We fail to see negligent action on the part of Lt. Wilson and Sgt. Macopson, or either of them. It is quite clear that they were aware of the purpose of the fire. A pertinent part of the Guidebook is found in the Deputy's findings of fact: "In handling

emergencies arising in the State Prison System, competing interests shall be considered in the following priority order: (1) the general public safety; (2) the safety and welfare of hostages; (3) prevention of loss of life or injury to other personnel; (4) inmate welfare; (5) protection of property." It is obvious to us, from the findings of fact alone without reference to other supportive evidence in the Record not included in the findings, that had the two men gone into that dormitory, the inmates would have overpowered them and taken them hostage, injured, or killed them and that the same treatment would have then been accorded Guards Brooks and Buckner as the inmates made their way out of the prison and back into society again to prey upon the general public, committing other crimes of violence as they went. There is absolutely no conflict in the evidence that neither Lt. Wilson nor Sgt. Macopson could see anything but a little smoke. There was nothing to warn them of the holocaust which was to occur in a very few minutes. Neither they nor Brooks and Buckner and Cox had guns. The findings of fact relate that "in a very short time" the fire was completely out of control with flames shooting to the ceiling. The evidence is not in conflict on that point. It took only a very few minutes. To charge these men with negligence for refusing to risk their lives and the lives of other personnel in a futile attempt to prevent an escape is, we think, totally unrealistic. We, therefore, reverse the action of the Commission in adopting as its own the Deputy Commissioner's conclusions Nos. 4 and 5.

Because we fail to find actionable negligence on the part of the prison officials, we do not discuss the question of the contributory negligence of the inmates, plaintiffs' only other assignment of error. Nor do we discuss the defendant's remaining cross assignments of error.

Upon the plaintiffs' appeal, the striking of the Deputy Commissioner's conclusion No. 3, resulting in the decision of the Industrial Commission that Deputy Director was not negligent, is affirmed.

Upon the defendant's cross appeal, the adoption by the Industrial Commission of Deputy Commissioner's conclusions

of law Nos. 4 and 5, resulting in the decision of the Commissioner that Lt. Wilson and Sgt. Macopson were negligent, is reversed.

Judges PARKER and MARTIN (Robert M.) concur.